## Case No. 2,598.

### CHAPIN et al. v. The HATTIE ROSS.

District Court, D. Connecticut. Aug. Term, 1866.

COLLISION—LIGHTS—LOOKOUT—BURDEN OF PROOF.

[1. A libel for damages caused by collision should particularly set out the facts relied on to charge the libeled vessel with fault.]

[2. Where the answer admits the failure to have proper lights set, the burden of proof is on the vessel to prove her freedom from fault.]

[3. An erroneous maneuver, made under apprehension of peril from an approaching vessel, and without opportunity for deliberation, is not chargeable as a fault.]

[4. That a vessel sunk by collision had an incompetent lookout, is not a fault, if his incompetence did not contribute to the disaster.]

[See The Young America, Case No. 18,179; The Victor, Id. 16,933; Shirley v. The Richmond, Id. 12,795; The Atlas, Id. 633; The Pennsylvania, Id. 10,950 and Id. 10,947; The Empire State, Id. 4,474.]

[In admiralty. Libel by Charles E. Chapin and others, owners of the brig Tornado, against the schooner Hattie Ross, for damages sustained by collision.]

SHIPMAN, District Judge. This libel is prosecuted to recover damages for the loss at sea of the brig Tornado in consequence of a collision with the schooner Hattie Ross. The collision occurred on the Atlantic ocean in latitude about 34° north, and longitude about 70° west, on the 18th of May 1865, between 12 and 1 o'clock in the morning. The pleadings in the cause are inexcusably imperfect and meagre. The libel is barely sufficient to warrant the court to found a decree upon it. Had exceptions been filed by the claimants to its sufficiency, the court would have at once ordered it amended, and the particular facts upon which a decree is asked for by the libellants set forth with proper fullness and precision. The principal material fact alleged is that the collision occurred in consequence of the omission of the Hattie Ross to carry the lights required by law, or any lights whatever. It is not alleged in the libel that the night was dark, nor is the state of the weather described at all. Neither the direction or velocity of the wind, or the course of the vessels, or their manner of approach or contact, is set forth. The libel does not even aver that the Tornado had the lights required by law, or any lights. It does charge that the schooner struck the brig amidships, cut into her and sunk her, and that the disaster was wholly owing to the failure of the schooner to carry lights. The answer admits the collision and its destructive consequences, denies that it was owing to the cause set up in the libel, and avers that it was wholly the result of negligence on part of the Tornado. The answer is quite as general as the libel.

The burden of proof in this case is clearly on the claimants. The Hattie Ross confessedly had no lights set. In cases of collision, where an ordinary and proper measure of precaution has been omitted, the burden of proof is on the vessel guilty of the omission to show that the collision was not caused by her neglect. The Lion, Spr. 44. This is emphatically the case where the omitted precaution was one required by statute. Waring v. Clarke, 5 How. [46 U. S.] 441. In the latter case the respondents had neglected to carry the lights required by the act of congress of July 7, 1838. See, also, The Margaret v. The Tascar, 15 Law T. (N. S.) 86. The evidence for the libellants rests on the

statements of the master, mate, and lookout on the Tornado. They all appear to have been on deck from the time the Hattie Ross was discovered ·till she collided with the brig. Saunders, who was at the wheel, was not examined· as a witness. The night was rather dark, though stars were-visible. Some clouds hung on the horizon. The wind was in the neighborhood of S. E.,—the witness on neither side being very exact on this point. The wind was moderate,—not stronger than a five or six knot breeze. The Tornado was bound from Philadelphia to New Orleans, and the Hattie Ross from New York to Porto Rico. The Tornado was on her port tack on a course southerly and westerly, and the Hattie Ross on her starboard tack and a course southerly and easterly. As already stated, the Tornado had four men on deck, —the captain, mate, lookout, and wheelsman. The Hattie Ross had two men on deck,— the second mate, who was at the wheel, and a man on the lookout. The three witnesses who were examined on part of the Tornado, and who were on deck at the time the Hattie Ross was discovered, all swear positively that she had her lights set (both green and red) in their proper places. This point is controverted by the witnesses from the Hattie Ross; but only the two in charge of the deck saw the Tornado until near the moment of collision, and they did not see her until she was quite near. That they did not see the lights of the brig, is not sufficient to overcome the evidence of the libellant's witnesses on this. point. It is alleged by those on the Hattie Ross, that after the brig sunk, and her officers and crew were transferred to the former, they admitted that they had no lights. This is explicitly denied. On the· whole evidence on this point, the court is satisfied that the Tornado had her colored lights set in conformity to the requirements of the act of congress. It is conceded that the schooner had no lights set.

It appears from the concurrent testimony of the master, mate, and lookout on the Tornado that they discovered the Hattie Ross, some time before the collision, to starboard, and supposed she was running with a free wind. That after watching her some ·time they saw she was standing towards the brig, when the captain of the brig ordered the wheel hard down and her head sheets let go, when, almost immediately, the schooner struck her and she soon sunk, all hands escaping to the schooner. There is considerable discrepancy between these witnesses in their estimates of the time which elapsed after they discovered the Hattie Ross till the collision. But estimates of time on such an occasion can never be exact. An attempt to make them so usually excites suspicion, and tends to discredit the witness who assumes to measure time with accuracy under such circumstances. The court is entirely satisfied that, while the schooner was discovered a considerable distance off, her

course was mistaken by those on the brig, and this mistake was not discovered till it was too late to prevent a collision; or at least not till the vessels were so near as to excite great alarm on the Tornado. It was insisted on the argument that the captain of the brig ordered his wheel hard up instead of hard down, and that if he had not done so no collision would have taken place. The court will not stop to inquire into this alleged erroneous maneuver. Assuming it to have been an error, it was done under circumstances which make its consequences chargeable, not upon the Tornado, but on the Hattie Ross. Had the latter exhibited colored lights as required by law, there is every reason to believe that her course would have been made out by the Tornado, in ample time to have prevented a collision. The Tornado was not able to make out the course of the schooner until the vessels were very near each other, and then as the schooner was discovered to be approaching, and very near the brig, a movement must be made at once to avert the collision. The change had to be made by the brig instantly, with no opportunity for deliberation, and in the midst of more or less alarm and confusion. As was remarked by Chief Justice Taney in the case of The Genesee Chief v. Fitzhugh, 12 How. [53 U. S.] 443, "if an error was committed under such circumstances, it was not a fault." See, also, 1 Conkl. Adm. (Ed. 1857) pp. 388, 400, and cases there cited. The cases referred to by the author arose out of collisions between steamers and sailing vessels, but the same doctrine is applicable to the latter class of vessels colliding with each other.

If there were any doubt on the evidence for the libellants that the vessels were very near each other before the course of the schooner was made out by the brig, that doubt would be wholly dissipated by the testimony of the second mate of the schooner who was a witness for the claimants. He was in charge of the deck at and before the collision. In his examination in chief he says: "All I have got to say about the collision between the schooner and the brig Tornado is that I ·was at the wheel at the time, and the man on the lookout reported this vessel. I told him to take the wheel from me that I might go and see how she was. The minute I saw how the brig was I sung out to the man at the wheel of the Hattie Ross to put his wheel hard down. He jammed his wheel hard down, and I jumped on to the topgallant forecastle and sung out to them on board the Tornado to put their wheel hard down. The captain of the Tornado * * * sung out to the man at his wheel to heave his wheel hard up. Well we were shaking in the wind at the time those vessels came together." On being further questioned by the counsel for the claimants, this witness, when asked how near the Tornado was when he saw her, re-

plied "She was pretty close; I could not say how far off she was." This is not very clear or exact, but, on the cross-examination, this witness was asked, "How far from you was the Tornado when you got forward?" To which he replied: "Well, I could not exactly tell you. She was pretty close. I could not exactly say. I suppose, to my best judgment, she might be twice her length. She might be a little more or less. I could not say for certain." It is quite certain that, although the brig discovered the schooner some distance off, she could not make out her course till the vessels were in a most dangerous proximity. She appears to have ascertained the course of the schooner at about the same instant that the latter first sighted the brig. Had the Hattie Ross shown her colored lights as the law requires, there can be no doubt that the Tornado would have ascertained her course in ample time to have avoided the collision, as her officers and lookout were watching her, and endeavoring to make out the direction in which she was moving.

It was insisted on the hearing that the Tornado had no sufficient lookout. This is true. The man stationed for that purpose was a green hand—young and inexperienced. He was not such a lookout as the law requires. But as the schooner was discovered in time to have been avoided, and was narrowly watched by the officers of the Tornado for the purpose of ascertaining her course, but in vain, till it was too late, it is evident that the collision is not chargeable to the incompetence of the lookout. The schooner neglected a plain requirement of the statute, enacted for the very purpose of enabling her to disclose her course to an approaching vessel. Her fault in this respect was gross and inexcusable, and tended directly and immediately to produce the disaster. She has wholly failed to exculpate herself, and must be condemned to bear the consequences of the disaster.

Let a decree be entered for the libellants, with an order of reference to a commissioner to report the damages.